ALAN FRANK AND BARBARA FRANK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Frank v. Commissioner
Docket No. 5430-83.
United States Tax Court
T.C. Memo 1986-222; 1986 Tax Ct. Memo LEXIS 389; 51 T.C.M. (CCH) 1107; T.C.M. (RIA) 86222; June 2, 1986. Alan Frank, pro se. Donna J. Pankowski, for the respondent. SHIELDS
MEMORANDUM OPINION SHIELDS, Judge: Respondent determined a deficiency in petitioners' 1977 Federal income tax in the amount of $13,410 and an addition to tax under section 6653(a) [1] in the amount of $671. After concessions by petitioners, [2] the issues for decision are: (1) whether petitioners received unreported income in the amount of $17,150; and (2) whether petitioners are entitled to a business bad debt deduction under section 166. *390 For convenience, our findings of fact and opinion are combined. Some of the facts were orally stipulated at trial and are so found, as are additional facts which were deemed admitted under Rule 90 pursuant to an order dated February 22, 1984. Petitioners resided in Pittsburgh, Pennsylvania at the time their petition was filed. They filed a joint income tax return for the year 1977 with the Philadelphia Service Center. Alan Frank has been a lawyer since about 1963. At the time of trial he was a member of the firm of Frank and Radakovich. In the mid 1970's, petitioner also became a stockbroker and with two other individuals organized T.M.F., Inc. to trade in common stocks. The stockholders and directors of T.M.F. never had any formal meetings and never maintained any corporate or accounting books and records. However, with endorsements by one or more of its stockholders the corporation borrowed substantial sums from two local banks, Pittsburgh National Bank and Equibank, N.A. By early 1976 T.M.F. was unable to meet its financial obligations and ceased operations. On February 27, 1976, Pittsburgh National Bank obtained a judgment against petitioners in the approximate *391 amount of $25,000 on one of the loans made by the bank to T.M.F. Petitioners paid this judgment by August 16, 1976 from the proceeds of a second mortgage on their home. On December 20, 1977, Alan Frank paid $17,150 in cash to Equibank in order to obtain the release of four bonds pledged to secure a demand note of T.M.F. on which the principal balance due at that time was $29,758.91. Respondent determined that the $17,150 payment was made from unreported income. Petitioners contend that it was not made from unreported income but instead was made from the proceeds of a loan. Respondent's determination is presumptively correct and petitioners have the burden of proving otherwise. ; Rule 142(a). At trial, Alan Frank testified that the $17,150 was loaned to him by a personal friend so that he could make the payment on the T.M.F. note. He stated that the friend, Joe Litman, advanced the money without ever being asked and that the advance was made by means of a "bag full of cash." Frank further testified that Litman was repaid the full $17,150 in cash without interest in March of 1979 from Frank's part of the settlement of a *392 legal action brought by Frank and Radakovich against an unrelated third party. We are unable to accept Frank's uncorroborated testimony at trial primarily because it is contrary to the weight of the evidence and it is contradicted to some extent by his own statements on brief and to respondent's agents. In fact, we find petitioner's entire testimony to be vague, conflicting and totally unreliable. Initially we note that prior to trial Frank refused to disclose to respondent's representatives the name of the alleged lender maintaining that he had promised never to tell anyone where the money came from. At trial, however, he claimed the lender was the by then deceased Joe Litman and testified that he was never specifically requested to keep the loan a secret but had done so on his own accord. He further testified that he could then reveal Mr. Litman's name because Litman was deceased. Next we note that at trial Frank testified that he received only $17,150 from Litman but on brief he asserts that he borrowed $20,000.00 in cash from a personal friend." Also at trial, Frank testified that the cash allegedly used to repay Litman was derived from a personal check, made payable to *393 Zach Pilossoph, in the amount of $20,000 which he cashed on March 12, 1979. He was unable to produce the check. Respondent, however, produced a copy of the front of a check dated March 12, 1979 and signed by Frank on which the name of the payee had been obliterated. The copy with the payee's name already obliterated had been submitted by Frank to respondent's appellate officer with the explanation that the payee was the lender and his name had been deleted in order to conceal his identity. Petitioner also told the appellate officer that the entire $20,000 was given to the lender as repayment for the loan. We find the inconsistencies and contradictions set forth above to be a clear indication of Frank's lack of trustworthiness and of his ability to freely change his testimony to best suit his needs. Further evidence of his lack of credibility appears in such statements made by him at trial as the following: WITNESS: * * * I know I made statements from the Appellant's standpoint at that point [appellate office] which were somewhat testing of the truth. I did not want to reveal the name of Joe Litman, never did and never would have. And I'm sure that I did anything I could *394 to try and get a settlement as best I could with Mr. Paterra, and I may well have indeed said anything about the name of the payee * * *. The record before us contains a number of other conflicting statements and facts which tend to further impeach Frank's testimony. For instance, at one point he testified that in 1977 he could not have had earnings to the extent of $17,000. However, on his tax return for that year he reported gross receipts from the law practice of over $79,000 and net profits of over $22,000. Furthermore, he repeatedly stated that he had never dealt with the Internal Revenue Service prior to the commencement of this matter, but subsequently admitted to having been involved in a previous case when confronted with the appeals officer in that matter. Finally, we note that even though he had failed to fully comply with Rule 91 regarding stipulations prior to trial, at the request of Frank, the record was left open after the trial, in order to permit petitioners to introduce the original of the $20,000 check dated March 12, 1979 and the testimony of Zach Pilossoph and Frank's former partners. Since no such evidence was produced we conclude that if produced it *395 would not have been favorable to petitioners' position. , affd. . Since we find Frank's testimony incredible and unworthy of belief and since we have been shown no other proof to the contrary, respondent's determination that the $17,150 is unreported income is sustained. With respect to the bad debt issue, we find that for 1977 petitioner reported gross profits from legal services of $79,110 and expenses of $56,974 for a net profit from his law practice of $22,136. Among the expenses claimed was a deduction of $18,633 for business bad debts. Respondent disallowed the deduction in its entirety after determining that the $18,633 consisted of: (1) the nonbusiness bad debt of the $17,150 ($16,894 principal and $256 interest) paid by Frank to Equibank; (2) a capital contribution of $1,275 resulting from a transfer of that amount from petitioners' personal account to T.M.F.'s checking account; and (3) a nondeductible expense of $208. At trial, Frank contended that a business bad debt resulted from his payments made in 1977 on corporate notes of T.M. *396 F. [3] However, the record contains no evidence on this issue, it is not discussed in petitioners' brief, and is deemed abandoned by petitioners. Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, during the year in issue unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided. ↩
2. At trial, petitioners abandoned all issues except those set forth above. The concession included respondent's negligence determination under section 6653(a).↩
3. Pursuant to section 166(d)(2), a debt is a nonbusiness bad debt if it is other than "(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."↩